**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

L.T., etc., et al.,

       Plaintiffs,

v.                              CASE NO.  4:08cv332-RH/WCS

JUDY MANDRELL et al.,

       Defendants.

_____/

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

The State of Florida Department of Children and Families ("DCF") removed the plaintiff, a young girl, from her mother and placed her in foster care with her great aunt and uncle.  Years later, after the uncle pled no contest to committing a lewd and lascivious act on a different girl but was allowed by the presiding judge to return to the home with the plaintiff, the uncle sexually assaulted the plaintiff. She brings this action under 42 U.S.C. § 1983 against four state employees who were involved with the placement.  The defendants have moved for summary judgment.  I grant the motion.

## I.  Facts

On August 15,1995, DCF removed the 14-month old plaintiff and her infant

brother from their mother's custody because they were not receiving adequate care.

The defendant Judy Mandrell, a DCF protective-supervision counselor, drew

the assignment of finding a foster home.  Ms. Mandrell conducted a home study of

the children's great aunt and uncle, Vicki and Eddie Thomas.  Ms. Mandrell

recommended temporarily placing the children in the Thomases' custody.  Ms.

Mandrell's immediate supervisor, the defendant Lillie S. Pease, approved the

recommendation.

A background check was conducted shortly after the children were placed in

the Thomas home.  It indicated that many years earlier Mr. Thomas had been

convicted of a misdemeanor—possession of narcotics equipment—and Ms.

Thomas had been charged with but apparently not convicted of a felony—larceny.

The background check did not reveal any prior history of violence, sex offenses, or

child abuse.  Ms. Mandrell and Ms. Pease ultimately concluded that the Thomases

were capable of providing the children a safe and loving home and approved the

placement.  Ms. Mandrell continued to make monthly home visits to assess the

living arrangements and the children's welfare.

On August 21, 1996, Mr. Thomas was charged with a lewd and lascivious

act on a child under age 16.  The alleged victim was the 13-year-old daughter of a

woman Mr. Thomas was seeing despite being married to Ms. Thomas.  The state

later amended the charge to add a count for sexual battery on a child by a familial

or custodial authority.

 While the charges were pending, the Florida trial court ordered Mr. Thomas

to have no contact with the victim or her family, to vacate the home where Mr.

Thomas had lived with Ms. Thomas and the plaintiff and her brother, and to have

no contact with any children.  Mr. Thomas moved into his mother's garage just

down the street from the home where Ms. Thomas lived with the plaintiff and her

brother.

 DCF became aware of the charges against Mr. Thomas—and of the court's

no-contact order—when the plaintiff's biological mother advised Ms. Mandrell of

the charges and asked that the plaintiff be removed from the Thomas home.  Ms.

Mandrell spoke with Ms. Thomas about the allegations.  Ms. Mandrell visited Mr.

Thomas's mother's home to confirm that Mr. Thomas was living there.   Ms.

Mandrell continued to report that the plaintiff and her brother were thriving and

that Ms. Thomas was providing good care.   On several occasions, Ms. Mandrell

reminded Mr. Thomas that he could not have contact with the children.

 On December 20, 1996, Ms. Mandrell arrived at Ms. Thomas's home to find

Mr. Thomas standing outside with groceries and with gifts for the children.  Ms. Mandrell reminded Mr. and Ms. Thomas of the no-contact order.  But Ms. Mandrell did not report the incident to the court.

On January 31, 1997, the charges against Mr. Thomas went to trial.  The jury acquitted him of sexual battery but was unable to reach a verdict on the lewd-and-lascivious-act charge.  On March 25, 1997, a retrial of the lewd-and-lascivious-act charge again produced a hung jury.  On April 9, 1997, Mr. Thomas pled no contest to that charge and was sentenced to five years probation.  As part of the sentence, Mr. Thomas was ordered to have no contact with the victim and her family, and he was required to attend sex-offender classes.

The same judge presided over both of Mr. Thomas's trials.  The judge also presided over the dependency case involving the plaintiff and her brother.  On May 9, 1997—one month after Mr. Thomas entered his plea and was sentenced to probation—the judge entered an order allowing Mr. Thomas to return to the home with Ms. Thomas and the children.  The judge authorized Mr. Thomas to have unsupervised contact with the children.

Ms. Mandrell continued to make monthly home visits.  She noted that Mr. Thomas's lewd-and-lascivious-act case barred the Thomases from adopting, but she recommended the continuation of the foster-care arrangement.  Each month,

Ms. Mandrell's report said there was little or no risk of abuse to the children.

On March 3, 2000, the same judge, acting in the dependency case, approved the children's long-term placement with the Thomases, removing them from protective services.

A little over three years later, on March 24, 2003, an anonymous caller to DCF alleged that the plaintiff was being abused by Mr. Thomas and that both Mr. and Ms. Thomas were using drugs in the children's presence. The anonymous caller incorrectly asserted that Mr. Thomas was "a proven sex offender and is not supposed to be around children." The defendant Jennifer Johnson, a DCF child protective investigator, was assigned to investigate the allegations. The defendant Gayla Spivey, Ms. Johnson's supervisor, oversaw the investigation.

On March 25, 2003—the day after the anonymous report was received—Ms. Johnson interviewed the plaintiff, her brother, and Ms. Thomas. Both children denied the abuse allegations and said that they were happy in the Thomas home. The children said they understood the difference between good and bad touches and had never been touched in a manner that made them uncomfortable.

Ms. Johnson ran additional background checks on the Thomases and had them submit to drug tests. The background checks revealed nothing new. The drug tests came back negative. Ms. Johnson prepared a report concluding that the

plaintiff and her brother were not being abused and were not at risk of abuse.  Ms.

Johnson concluded that the case should be closed.  Her supervisor, Ms. Spivey,

approved the report and the closing of the case.

On February 24, 2005, the plaintiff ran away from the Thomas home.  She

was found by law enforcement officers.  She said she ran away because she had

been sexually abused by Mr. Thomas and physically abused by Ms. Thomas.  The

plaintiff told the officers that Mr. Thomas sexually abused her from October 2004

to late December 2004.  DCF immediately removed the plaintiff and her brother

from the Thomas home.

## II.  Procedural Context

The plaintiff brings this case through her legal guardian.  She asserts that the

four defendants—Ms. Mandrell, Ms. Pease, Ms. Johnson, and Ms. Spivey— were

deliberately indifferent to the risk that Mr. Thomas would sexually abuse her, thus

violating her right to substantive due process under the Fourteenth Amendment.

The plaintiff seeks an award of damages against these defendants individually

under 42 U.S.C. § 1983.  The plaintiff originally asserted state-law claims against

these defendants and also asserted claims against other defendants, but the plaintiff

has withdrawn the claims.

In addition to alleging sexual abuse by Mr. Thomas, the plaintiff accuses *Ms.*

Thomas of physical—not sexual—abuse.  But the defendants had no information at
all suggesting a risk of physical abuse by Ms. Thomas.  The case rises or falls on
the sexual abuse by Mr. Thomas.

The defendants deny that they were deliberately indifferent to the risk of
abuse and assert that they have qualified immunity.  They have moved for
summary judgment.  In addressing the motion, the record of course must be viewed
in the light most favorable to the plaintiff as the nonmoving party.  Conflicts in the
evidence must be resolved and all reasonable inferences from the evidence must be
drawn in the plaintiff's favor.  Summary judgment is appropriate if, when the facts
are viewed in this manner, the moving party is entitled to prevail.  *See* Fed. R. Civ.
P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d
265 (1986).

## III.  Legal Standards

The case presents two issues: whether the defendants violated the plaintiff's
right to substantive due process, and whether, if they did, they nonetheless have
qualified immunity from the plaintiff's claims.

A line of Eleventh Circuit cases addresses a foster child's substantive-due-
process right to be free from abuse.  *See Taylor v. Ledbetter*, 818 F. 2d 791 (11th
Cir. 1987) (*en banc*); *Ray v. Foltz*, 370 F. 3d 1079 (11th Cir. 2004); *H.A.L. v.*

*Foltz*, 551 F.3d 1227 (11th Cir. 2008); *see also Nichols v. Maynard*, 204 Fed.

Appx. 828 (11th Cir. 2006); *Omar v. Babcock*, 177 Fed. Appx. 59 (11th Cir. 2006).

As these cases make clear, an individual state employee has a constitutional duty to

protect a foster child from a substantial risk of serious harm at the hands of others.

But liability attaches only when the employee acts intentionally or with "deliberate

indifference" to such a risk.  An employee's negligence may subject her employing

agency to liability under state law, *see* Fla. Stat. § 768.28—and indeed the plaintiff

is pursuing a separate negligence claim against DCF in state court—but negligence

without more is not a constitutional violation.

The Supreme Court defined "deliberate indifference" in *Farmer v. Brennan*,

511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The issue there was

the liability of a prison official for failing to protect an inmate from sexual abuse

by another inmate.  The Court said a prison official is deliberately indifferent—and

thus can be held liable—only if the official

> knows of and disregards an excessive risk to inmate health or safety;
> the official must both be aware of facts from which the inference
> could be drawn that a substantial risk of serious harm exists, *and he
> must also draw the inference*.

*Farmer*, 511 U.S. at 837 (emphasis added).

As the Eleventh Circuit has recognized, this same definition of "deliberate

indifference" governs a state employee's liability for failing to protect a foster

child from abuse by a foster parent or from another foster child.  *See, e.g., Ray v. Foltz*, 370 F. 3d 1079, 1083 (11th Cir. 2004).  And as the definition makes clear, no liability arises "for an official's failure to alleviate a significant risk that he should have perceived but did not . . . ."  *Burnette v. Taylor*, 533 F. 3d 1325, 1331 (11th Cir. 2008) (internal citations and quotations omitted).

A finding that the defendants violated the plaintiff's rights would not end the inquiry.  A public official sued individually for damages may invoke the doctrine of qualified immunity.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986); *see generally Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  Although the focus of qualified-immunity analysis often is on whether the applicable law was clearly established at the relevant time, *factual* uncertainty also is part of the equation.

The law is (and was at the relevant time) clearly settled that a state actor must not be deliberately indifferent to a substantial risk of serious harm to a foster child.  *See Ray v. Foltz*, 370 F. 3d 1079, 1082 (11th Cir. 2004) (holding that *Taylor* clearly established this principle in 1987).  But the state actor loses her qualified immunity only if this standard applies to the facts of the case "with obvious

clarity." *H.A.L. v. Foltz*, 551 F.3d 1227, 1232 n.6 (11th Cir. 2008).  If the facts known to the state actor leave it "unclear" whether the child faces a "substantial risk" of serious harm, "qualified immunity . . . should apply."  *Id.* at 1232.  This is but a specific application of the general principle that qualified immunity protects all but the plainly incompetent and those who knowingly violate the law.

## IV.  Applying the Standards

The information available to the defendants—and thus the basis for their assessment of whether the plaintiff faced a substantial risk of serious harm—changed over time.  This order addresses each relevant time period in turn.

### A.  *The Initial Placement*

When the plaintiff and her brother were initially placed in the Thomas home in 1995, neither Ms. Mandrell nor her supervisor Ms. Pease had any reason to believe the children were facing a substantial risk of serious harm.  Mr. and Ms. Thomas each had a minor criminal history, but neither had been charged with, let alone convicted of, an offense involving violence, sexual abuse, or mistreatment of children.  The Thomases were the children's great aunt and uncle, apparently the best available family members.  The record suggests no basis for a conclusion that placing the children with the Thomases was negligent or even ill advised.  And the record suggests no basis for believing Ms. Mandrell did anything less than a

thorough job of investigating.  The plaintiff has pointed to nothing that Ms.
Mandrell or Ms. Pease could or should have done at that time that would have
yielded different or less favorable information.  Placing the children with the
Thomases was not a constitutional violation.

### B.  While Charges Against Mr. Thomas Were Pending

The 1996 charge that Mr. Thomas sexually abused a girlfriend's 13-year-old
daughter dramatically changed the situation.  Mr. Thomas denied the charge, but
that of course did not mean it could be ignored.  Had Ms. Mandrell or Ms. Pease
done nothing, a claim of deliberate indifference might easily be sustained.

But Ms. Mandrell did not do nothing.  She promptly investigated.  She spoke
with Ms. Thomas and learned that the court had ordered Mr. Thomas out of the
home.  Ms. Mandrell spoke with Mr. Thomas's mother and confirmed that Mr.
Thomas had indeed moved in with her—thus complying with the order to move
out of the home where the children lived.  Ms. Mandrell found Mr. Thomas at the
home once, delivering groceries and Christmas presents, and she failed to report it
to the court.  Even so, the record includes no evidence that Mr. Thomas was there
at other times.  Ms. Mandrell continued to monitor the situation and continued to
include in her reports an assessment that the risk of abuse was nonexistent or low.
Mr. Thomas did not abuse the plaintiff during this time.

A suitably cautious protective-services worker perhaps could conclude that a foster child faces a substantial risk of harm when (1) she is left in a home with a foster mother whose husband has been charged with, but not convicted of, sexually assaulting a different and substantially older child; (2) the husband has been ordered to move out and to have no contact with the foster child; (3) the husband has moved out as ordered; and (4) the husband nonetheless has gone to the home on at least one occasion to deliver groceries and Christmas presents.

For three reasons, however, the plaintiff cannot recover based on the decision to leave her in Ms. Thomas's home during this period.

First, and most importantly, the plaintiff was not abused by Mr. Thomas during this period.

Second, under *Farmer*, a state actor who is aware of facts that would support an inference that a person faces a substantial risk of serious harm, but who fails to draw the inference, is not deliberately indifferent and thus cannot be held liable. The record includes nothing to refute Ms. Mandrell's and Ms. Pease's testimony that they did not draw an inference that the plaintiff was facing a substantial risk of serious harm from Mr. Thomas during this period.  To be sure, facts can point so strongly to a substantial risk that a reasonable juror could disbelieve a state actor's testimony that she did not perceive the risk.  But the underlying facts are not that

strong here.

Third, the law was not clear that facts like these were sufficient to create a substantial risk of serious harm to the child or that the move-out-and-have-no-contact order was not a sufficient means of protecting the child.  Failing to take further action did not violate clearly established law.  Ms. Mandrell and Ms. Pease have qualified immunity from claims arising during this period.

### C.  After the No-Contest Plea but Before the Anonymous Report

After two trials failed to produce a conviction, Mr. Thomas entered a no-contest plea to the charge of committing a lewd and lascivious act on a person under age 16.  The state judge withheld adjudication of guilt.  Neither the plea nor the withholding of adjudication settled the question of whether Mr. Thomas was guilty.

The state judge put Mr. Thomas on probation and let him move back into the home with Ms. Thomas and the children.  These rulings did not relieve Ms. Mandrell or Ms. Pease of their duty to monitor the situation and to protect the plaintiff from abuse, but the rulings were nonetheless relevant.  The rulings reflected the views of the presumably-reasonable judge who presided over the criminal trials and thus was well aware of the strength of the evidence and the details of the alleged crime.

The plaintiff cannot recover based on the decision to leave her in the Thomas home during this period, for two reasons.

First, the plaintiff was not abused by Mr. Thomas during this period.

Second, the law was not clear that facts like these—including both an unresolved accusation that a foster parent abused another child and the presiding judge's decision to return the parent to the home with unsupervised contact—were sufficient to create a substantial risk of serious harm to the child. Failing to take further action under these circumstances thus did not violate clearly established law. Ms. Mandrell and Ms. Pease have qualified immunity from claims arising during this period. *See H.A.L. v. Foltz*, 551 F.3d 1227, 1232 n.6 (11th Cir. 2008) (noting that a protective-services worker has qualified immunity from a foster child's claim unless the governing standard—that the child must be protected from a substantial risk of serious harm—applies to the facts with "obvious clarity").

In upholding the qualified-immunity defense, I have not overlooked a contrary argument. A protective-services worker violates a foster child's right to substantive due process only if the worker acts with "deliberate indifference" to a substantial risk of serious harm, that is, only if the worker knows facts that would support an inference that the child is at risk and the worker *actually draws the inference*. One could assert that a worker who actually draws the inference, but

who fails to act, knowingly violates the law and thus loses her qualified immunity.
But the assertion would be incorrect.  It improperly conflates the subjective
component of deliberate indifference with the objective standard that governs
qualified immunity.  The Eleventh Circuit's most recent foster-child decision
separately addresses—it does not conflate—the deliberate-indifference and
qualified-immunity standards.  *See H.A.L.*, 551 F.3d at 1232 & n.6.

The conclusion that the deliberate-indifference and qualified-immunity
inquiries ought not be conflated is consistent with the view that qualified immunity
should turn on an objective standard that may be applied earlier in the litigation
than would be possible if the test were subjective.  *See Pearson v. Callahan*, 555
U.S. __, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009) (holding that a court has the
discretion to decide a case based on qualified immunity without reaching the merits
of the underlying constitutional claim); *Rioux v. City of Atlanta, Georgia*, 520 F.3d
1269, 1282 (11th Cir. 2008) (noting that an official has qualified immunity unless
an objective observer could predict at the time that her conduct was unlawful);
*Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991)
(*per curiam*) (noting that qualified immunity should be determined at the earliest
possible stage of the litigation).

To be sure, if this incorrect "conflation" theory were accepted, this case

would present a closer question.  Ms. Mandrell and Ms. Pease could and perhaps should have drawn an inference, after Mr. Thomas entered his plea and returned to the home, that he posed a substantial risk of serious harm to the plaintiff.  But Ms. Mandrell and Ms. Pease have testified that they did not draw the inference.  The assertion that a reasonable juror could disbelieve their testimony on this is weak. The record shows without genuine dispute that Ms. Mandrell and Ms. Pease were diligent and dedicated to the children.  The plaintiff has pointed to nothing they failed to investigate and nothing they should have done—except make a different decision.  In sum, I would grant summary judgment even if the deliberate-indifference and qualified-immunity standards were conflated, but the issue would be closer.

### D.  *After the Anonymous Report*

On March 24, 2003, an anonymous caller said that Mr. Thomas was abusing the plaintiff and that both Mr. and Ms. Thomas were using drugs in the presence of the plaintiff and her brother.  The plaintiff had just turned nine years old.

Ms. Johnson began an investigation the next day.  She interviewed the children, who denied the allegations.  She had the Thomases submit to drug tests, which were negative.

The plaintiff asserts that Ms. Johnson interviewed the plaintiff and her

brother in Ms. Thomas's presence and that this was improper.  If it happened, it was indeed a poor and unreliable way to conduct a child-abuse investigation.  But the record does not seem to support the allegation.  More fundamentally, the plaintiff apparently makes no assertion, even now, that by that point Mr. Thomas had assaulted her.  The charge, instead, is that Mr. Thomas assaulted her from October 2004 until December 2004.  Ms. Johnson's March 2003 investigation of course could not have uncovered abuse that had not yet occurred.

The anonymous caller also leveled other charges that were demonstrably untrue.  The caller said Mr. Thomas was a convicted sex offender, but he was not; the state judge had withheld adjudication of guilt.  And the caller said Mr. Thomas was not allowed to have contact with children, but he was; the state judge had explicitly so ruled.  The most likely explanation is that the caller had inaccurate information from the earlier criminal case.  DCF already knew about the case and the actual outcome.  And Ms. Johnson confirmed the facts again.

In sum, the anonymous call changed the situation only a little.  A diligent investigation produced no new information at all.  Even an anonymous and apparently unfounded allegation can be a red flag.  But this one had little weight. It still was not clear that facts like these—still including the presiding judge's decision to return the parent to the home with unsupervised contact—were

sufficient to create a substantial risk of serious harm to the child.

The defendants learned nothing else until the plaintiff ran away from the Thomas home and reported that she had been abused.  It was a tragedy.  But the facts known to the defendants at the time of the abuse did not, with "obvious clarity," pose a substantial risk of serious harm to the plaintiff.  *H.A.L.*, 551 F.3d at 1232 n.6.  By failing to act, the defendants did not "knowingly violate the law," and they were not "plainly incompetent."  *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).  The defendants have qualified immunity.

## V.  Conclusion

For these reasons,

IT IS ORDERED:

The defendants' motions for summary judgment (documents 112, 113, 114, and 115) are GRANTED.  The clerk must enter judgment stating, "All federal-law claims against the defendants Judy Mandrell, Lillie S. Pease, Jennifer Johnson, and Gayla Spivey are dismissed with prejudice.  All state-law claims against these defendants are dismissed without prejudice.  Judgment dismissing all claims against other defendants was entered previously.  No claims remain pending."  The clerk must close the file.

SO ORDERED on July 8, 2009.

s/Robert L. Hinkle
United States District Judge